UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CIVIL ACTION NO. 3:15-cv-00578-JHM

MARLENA ALDRICH and                                    PLAINTIFFS
KRISTEN NOLAN

V.

THE UNIVERSITY OF                                      DEFENDANT
PHOENIX, INC.

MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion to Dismiss and Compel Arbitration [DN 6]. Fully briefed, this matter is ripe for decision. For the following reasons, the Motion to Dismiss is **GRANTED**.

I. BACKGROUND

Plaintiff Marlena Aldrich and Plaintiff Kristen Nolan (hereinafter collectively "Plaintiffs") filed the instant action asserting claims arising from or related to their employment with Defendant, the University of Phoenix, which included a putative class action claim and wrongful termination claims. (Def.'s Mem. Supp. Mtn. Dismiss [DN 6-1] at 2.) Plaintiff Aldrich began her employment in October of 2005 and Plaintiff Nolan began in July of 2006. (Id.) Plaintiff Aldrich was employed as a National Defense Liaison (hereinafter "NDL") and Plaintiff Nolan was employed as an NDL Manager. (Id. at 2–3.) Plaintiffs were employed in Defendant's military division tasked with recruiting service members and veterans to attend the University of Phoenix. (Pls.' Resp. [DN 24] at 3.)

Defendant receives Title IV funds from the Department of Education (hereinafter "DOE"), premised upon the fact that Defendant will not engage in certain types of "enrollment, recruitment and recruitment activities" that use incentive schemes. (Pl.'s Compl. [DN1-2] at 2–

3.)  Plaintiffs allege that this type of incentivized recruitment is banned by the Higher Education Act (hereinafter "HEA") and the Program Participation Agreement (hereinafter "PPA") that Defendant entered into with the DOE in order to receive the Title IV funds.  (Id. at 2.) Plaintiffs state that Defendant utilized "remuneration schemes (incentive compensation) for its employees based on enrollment, recruitment and/or recruitment activities."  (Id. at 2–3.)  In discharging their duties, Plaintiffs claim that they were required to meet certain goals in recruiting current or former military members.  (Id. at 2.)  Additionally, Plaintiffs claim that they were required to use "high pressure recruitment tactics," make "substantial misrepresentations concerning the nature of the educational program," and refrain from disclosing certain unsavory aspects of the program and potential future career and/or educational prospects.  (Id. at 4–5.)  Plaintiffs claim that they were unwilling to engage in the "unfair, deceptive, misleading, unconscionable, fraudulent, and unlawful acts and practices" and therefore did not meet recruitment goals, which ultimately "resulted in their respective terminations."  (Id. at 14.)  Therefore, Plaintiffs assert a claim for wrongful termination, as their terminations were in violation of "public policy" and because they "were occasioned by fraud, oppression and/or malice."  (Id. at 16.)

Plaintiffs allege that Defendant required Plaintiffs to engage in this heavy handed and military-focused recruitment style so that Defendant could work around the 90%-10% revenue requirement imposed by Title IV.  (Pl.'s Resp. [DN 24] at 2.)  This 90%-10% "rule requires [Defendant] to maintain a strict accounting regimen as to demonstrate that 10% or more of its revenue comes from non Title IV sources" and instead derives from private funding.  (Id.)  The underlying reasoning for this rule is that by receiving at least 10% of revenue from private outside sources, Defendant proves to the DOE that it is a reputable institution "delivering a legitimate educational product."  (Id.)  However, Defendant can circumvent this rule by

recruiting current or former military members who "are eligible for tuition and related educational costs as a benefit of their service." (Id.)  The source of the funds used to pay for these students' educations derives from the Department of Defense. (Id.)  Therefore, while the funds may not be from a private source, they are not considered to be Title IV funds in the accounting, and they instead count toward the 10% requirement. (Id.)  Therefore, Plaintiffs claim that Defendant used heavy military recruitment to work around the 10% requirement. (Id.)  Plaintiffs assert that using this "loophole" to get around the 10% requirement is central to Defendant's business model, as it could not meet the requirement otherwise. (Id.)  Therefore, Plaintiffs were heavily "pressured to recruit service members and veterans" because it was of grave importance to Defendant's "corporate life." (Id. at 3.)

Further, Plaintiffs assert wage and hour claims against Defendant individually and on behalf of a class of all current and former employees of Defendant. (Pl.'s Compl. [DN 1-2] at 16.)  Plaintiffs claim that they were consistently denied overtime payments in violation of KRS 337.285. (Id. at 14.)  Additionally, Plaintiffs assert that Defendant failed to record Plaintiffs' overtime hours under KRS 337.320 and failed to pay Plaintiffs all wages due upon termination in violation of KRS 337.055. (Id.)  Plaintiffs further posit that these wage and hour violations are common to an entire class of current and former employees, supplying the basis for their class action claim. (Id. at 14–16.)

However, Defendant contends that Plaintiffs have "entered into a valid arbitration agreement . . . which broadly encompasses 'any dispute arising out of or related to [their] employment or termination of employment with [Defendant].'" (Def.'s Mem. Supp. Mtn. Dismiss [DN 6-1] at 1.)  Therefore, Defendant argues, because the arbitration agreement is valid, enforceable, and encompasses each of Plaintiffs' claims, "this matter should be dismissed in its

entirety under Federal Rule of Civil Procedure 12(b)(6), or in the alternative, arbitration should be compelled and this action stayed pursuant to Sections 3 and 4 of the FAA (9 U.S.C. § 3, 4)." (Id.)

In regards to the agreement, Plaintiffs began working in 2005 and 2006.  (Tartaglio's Aff. [DN 6-2] ¶¶ 15–16.)  Both received multiple versions of the Employee Handbook, and each included a "Dispute Resolution Policy and Procedure" section, which included a mandatory arbitration provision.  (Id.)  The most recent version, distributed in 2012, required a specific acknowledgment upon receipt of the Handbook.   (Id. ¶ 6.)  On or around November 14, 2012, Defendant's Human Resources Department sent an email to all employees, including Plaintiffs, notifying them that the Handbook had been updated, along with a link to an electronic copy of the new Handbook, and requesting that they electronically acknowledge the new Handbook and its updates within 30 days.  (Id.)  The email instructed all employees to visit their MyHR page to complete the Acknowledgment Form and provided a link to the MyHR page.  (Id. ¶ 7.)  The MyHR system is Defendant's "HR-related employee intranet, which contains a variety of information about an employee's job, location, compensation, withholdings, etc." (Id. ¶ 8.)  All of Defendant's employees have access to this system, as all training and acknowledgments are processed through it, and each MyHR page is password protected with a unique password selected by each employee, meaning only that employee can access his or her MyHR page.  (Id. ¶¶ 9–10.)

According to Defendant's records, both Plaintiffs completed the Acknowledgment Form electronically by clicking "Accept" on the electronic document.  (Id. ¶¶ 15–16.)  Plaintiff Aldrich completed the form on November 14, 2012 and Plaintiff Nolan completed the form on December 27, 2012.  (Id.)  The Acknowledgment Forms that Plaintiffs electronically accepted also included

a link to the Employee Handbook so they could fully read and understand the contents of the arbitration agreement.  (Aldrich and Nolan Acknowledgment Forms [DNs 6-3, 6-4] at 2.)  The Acknowledgment Forms were identical and both specifically stated:

> NOTABLY, HOWEVER, THE ARBITRATION AGREEMENT FOUND IN THIS EMPLOYEE HANDBOOK MAY NOT BE UNILATERALLY REVISED, MODIFIED OR ELIMINATED BY THE COMPANY WITH RESPECT TO ANY COVERED DISPUTE AFTER THAT DISPUTE HAS BEEN SUBMITTED TO ARBITRATION PURSUANT TO THE ARBITRATION AGREEMENT. NOR WILL THE COMPANY REVISE, MODIFY OR ELIMINATE THE ARBITRATION AGREEMENT WITHOUT GIVING AT LEAST THIRTY (30) DAYS WRITTEN NOTICE TO EMPLOYEES. . . .
>
> I FURTHER ACKNOWLEDGE THAT I HAVE CAREFULLY READ THE ARBITRATION AGREEMENT FOUND IN THE EMPLOYEE HANDBOOK AND I UNDERSTAND AND AGREE TO ALL OF ITS TERMS. MORE SPECIFICALLY, I UNDERSTAND AND AFFIRM THAT BY SIGNING BELOW I AM AGREEING TO ARBITRATE EMPLOYMENT-RELATED LEGAL CLAIMS I MAY HAVE AGAINST THE COMPANY, JUST AS THE COMPANY IS AGREEING TO ARBITRATE ITS EMPLOYMENT-RELATED LEGAL CLAIMS AGAINST ME. I UNDERSTAND THAT THIS MEANS WE ARE BOTH WAIVING OUR RIGHT TO HAVE SUCH CLAIMS DECIDED BY A JUDGE OR JURY IN STATE OR FEDERAL COURT.

(Id.)  The Employee Handbook includes a "Binding Arbitration" section and labels the provision as the "Arbitration Agreement."  (Employee Handbook [DN 6-5] at 4.)  This section outlines exhaustive procedures for the resolution of complaints and includes a class action waiver.  (Id. at 4–6.)  After receiving the new Handbook and accepting the terms on their respective Acknowledgment Forms, Plaintiffs continued working for Defendant, receiving assignments and compensation.  (Def.'s Mem. Supp. Mtn. Dismiss [DN 6-1] at 6.)

Defendants now seek the enforcement of this arbitration agreement and class action waiver, claiming both are valid and enforceable.  (Id. at 6.)  However, Plaintiffs assert that for reasons of public policy and lack of an arbitration provision, standing, a contractual agreement,

and an acceptance of contractual terms, the Court should deny Defendant's motion.  (Pls.' Resp. [DN 24] at 3, 4, 6, 8, 10.)

## II. STANDARD OF REVIEW

"Congress enacted the United States Arbitration Act of 1925, more commonly referred to as the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1–16, in response to the common law hostility toward arbitration and the refusal of many courts to enforce arbitration agreements." Braxton v. O'Charley's Rest. Properties, LLC, 1 F. Supp. 3d 722, 725 (W.D. Ky. 2014).  Since then, the United States Supreme Court has declared that the FAA "establishes a national policy favoring arbitration when the parties contract for that mode of dispute resolution." Preston v. Ferrer, 552 U.S. 346, 349 (2008).  Additionally, the FAA's "purpose was to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24 (1991) (citing Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 219–220, n. 6 (1985); Scherk v. Alberto-Culver Co., 417 U.S. 506, 510, n. 4 (1974)); see also E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 289 (2002). "The FAA establishes a procedural framework applicable in both federal and state courts, and also mandates that substantive federal arbitration law be applied in both." Braxton, 1 F. Supp. 3d at 725 (citing Allied–Bruce Terminix Cos. v. Dobson, 513 U.S. 265 (1995); Southland Corp. v. Keating, 465 U.S. 1 (1984)).

Before a court can compel arbitration, it "must engage in a limited review to determine whether the dispute is arbitrable." Masco Corp. v. Zurich Am. Ins. Co., 382 F.3d 624, 627 (6th Cir.2004) (quoting Javitch v. First Union Sec., Inc., 315 F.3d 619, 624 (6th Cir.2003)).  In order to engage in this review, the Sixth Circuit "requires the Court to determine first whether a valid

agreement to arbitrate exists between the parties, and second whether the specific dispute falls within the substantive scope of the agreement." Braxton, 1 F. Supp. 3d at 726. "[T]he nonmovant must show that there is a genuine issue of material fact as to the validity . . . of the agreement to arbitrate, which is the same standard used for summary judgment." Broaddus v. Rivergate Acquisitions, Inc., No. 3:08-0805, 2008 WL 4525410, at *1 (M.D. Tenn. Oct. 1, 2008) (citing Great Earth Companies, Inc. v. Simons, 288 F.3d 878, 889 (6th Cir. 2002); Cottrell v. Club Demonstration Services, No. 06-14763, 2007 WL 2413070 at * 1 (E.D. Mich. Aug. 2, 2007). Here, Plaintiffs do not argue that their claims fall outside the scope of the arbitration agreement; therefore, the sole issue is whether a valid and enforceable arbitration agreement exists.

### III. DISCUSSION

#### A. Public Policy

Plaintiffs first argue that this Court should not compel arbitration because to do so would serve "as an enabler of unlawful activity." (Pls.' Resp. [DN 24] at 4.) Plaintiffs explain:

> "The United States has an interest in the unlawful activities at issue in the Complaint as a result of it having insured the student loan indebtedness and/or being the payor in the first instance for the tuition charges of the service members and veterans. Indeed, if the instant litigation exposes violation of the Program Participation Agreement, [Defendant] might well have to refund a significant portion of the non Title IV funds received. This in turn implicates [Defendant's] 90%-10% compliance potentially compromising Title IV funding. This is the context for the Motion to Compel Arbitration which prevents a public airing of matters that are of public interest and have an impact well beyond the parties involved."

(Id.) Plaintiffs cite no authority for this position, but simply appeal to the Court using a public policy rationale. Plaintiffs' argument that arbitration is uneforceable due to the severe public policy considerations involved in the compromising of Title IV funding is nothing more than a "generalized attack on 'arbitration as a method of weakening the protections afforded in the

substantive law.'" Prasad v. Gen. Elec. Co., No. 2:13-CV-272, 2014 WL 934577, at *4 (S.D. Ohio Mar. 10, 2014) (quoting Rodriguez de Quijas v. Shearson/Am. Exp., Inc., 490 U.S. 477, 481 (1989)). The U.S. Supreme Court has rejected similar arguments, reasoning "claims arising under a statute designed to further important social policies may be arbitrated so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum." Green Tree Fin. Corp.-Alabama v. Randolph, 531 U.S. 79, 90 (2000) (citations omitted).

Plaintiffs have not argued that their claims would not be effectively vindicated through arbitration, but instead rely solely on the public policy argument that arbitration would shield Defendant's wrongdoing. Therefore, the "effective vindication" exception to the FAA does not apply to Plaintiffs' public policy claims. Regardless, Plaintiffs' "assertion that claims involving important public interests are not subject to arbitration is not supported by precedent." Prasad, 2014 WL 934577, at *4; see, e.g., Rodriguez de Quijas, 490 U.S. at 485 (holding that the Securities Act of 1933 can be appropriately resolved through arbitration); Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 636–37 (holding that claims arising under the Sherman Act are subject to arbitration). Accordingly, Plaintiffs' attempt to use public policy rationale in order to avoid arbitration must fail.

### B.  Lack of Arbitration Provision in a Larger Contract

Plaintiffs next argue that because the arbitration agreement was a pre-dispute agreement and was not contained as a provision in the larger employment contract, it cannot be enforced. Specifically, Plaintiffs argue that pre-dispute agreements must be provisions contained in larger contracts, as the FAA states: "A written *provision* in any maritime transaction or a contract evidencing a transaction involving commerce *to settle by arbitration a controversy thereafter*

8

*arising out of such contract or transaction* . . . shall be valid, irrevocable, and enforceable . . . ." 9 U.S.C. § 2.  Whereas, a post-dispute agreement can take the form of a separate "agreement in writing," and that agreement can be its own separate document.  9 U.S.C. § 2.  Therefore, Plaintiffs assert that any pre-dispute arbitration agreement must be found "in a larger contract that sets forth the substantive rights and obligations of the parties."  (Pls.' Resp. [DN 24] at 5 (citing Butler Production Co. v. Unitrust, 367 F.2d 733 (7th Cir. 1966).)  Defendants answer, stating that Plaintiff's reading of the FAA does not comport with the statute's plain language, while also noting that "courts routinely enforce these kinds of pre-dispute employee/employer arbitration agreements."  (Def.'s Reply [DN 26] at 5–6.)

Indeed, pre-dispute arbitration agreements and acknowledgment forms have been consistently enforced as binding.  Polly v. Affiliated Computer Servs., Inc., No. CIV.A. 10-135-ART, 2011 WL 93715, at *1–3 (E.D. Ky. Jan. 11, 2011) (unequivocally accepting as a binding arbitration agreement an acknowledgment form electronically signed by the plaintiff evidencing the receipt and future review of the employee guidebook); Johnson v. Career Sys. Developments, No. CIV. A. 4:09CV-76-M, 2010 WL 292667, at *2 (W.D. Ky. Jan. 20, 2010) (treating an acknowledgment form, which simply acknowledged the receipt of the larger arbitration policy, as a binding agreement); see also Mazera v. Varsity Ford Mgmt. Servs., LLC, 565 F.3d 997, 1000 (6th Cir. 2009) (finding valid and enforceable an arbitration agreement memorialized in a document that stated "I acknowledge receipt of the Mandatory Complaint Procedure and understand that compliance with this Procedure is a term and condition of employment").  In Gatliff, the plaintiff received several acknowledgment forms that she was required to sign evidencing her acknowledgment and acceptance of the defendant's Employee Dispute Resolution Plan.  Gatliff v. Firestone Indus. Products Co., LLC, No. 2013-CA-001568-MR, 2015

WL 510680, at *1–2 (Ky. Ct. App. Feb. 6, 2015), review denied (Dec. 10, 2015). The Kentucky Court of Appeals treated the acknowledgment forms as contracts because the "Acknowledgments" that the plaintiff signed "specifically refer[red] to the plan as directing all legal disputes to mediation and arbitration, so the thrust of the plan could arguably be inferred from the acknowledgments themselves." Id. at *3. The Court of Appeals "believe[d] this language was sufficient to indicate to [the plaintiff]" that she "would be required to submit to [the defendant's] dispute resolution plan." Id. Further, the court unequivocally stated that "[t]he acknowledgments [the plaintiff] signed, in conjunction with the plans she was provided, were clearly valid agreements to binding arbitration." Id.

Here, Plaintiffs contend that the arbitration agreement is invalid and unenforceable as a contract because it was not contained in a larger agreement specifying the obligations of the parties. The Court declines to accept this unsupported argument. As seen, a pre-dispute acknowledgment form can serve as a binding arbitration agreement when it is clear that the signor is submitting to an arbitration agreement. The Acknowledgment Form here evidenced the receipt, reading, and understanding of the arbitration policy found within the Employee Handbook. It not only refers to the Handbook, but it itself states that the Plaintiffs must "arbitrate employment-related legal claims [they] may have against the company, just as the company" must "arbitrate its employment-related legal claims against [them]." (Aldrich and Nolan Acknowledgment Forms [DN 6-3, 6-4] at 2.) As proven time and again, no larger contract containing the arbitration provision is needed. Therefore, because the Forms make clear that Plaintiffs are agreeing to enter into a binding agreement, they can serve as valid, enforceable, and binding arbitration agreements on their own under the FAA.

### C.  Lack of Standing to Enforce Arbitration Provision

Next, Plaintiffs argue that Defendant was not a party to the arbitration agreements found in the Acknowledgment Forms and therefore has no standing to enforce them.  Plaintiffs assert that because the Acknowledgment Forms refer exclusively to the Apollo Group or "the Company," as opposed to Defendant University of Phoenix, Defendant was not a party to the agreements.  Plaintiff states that simply because Apollo Group is the parent company, "a parent-subsidiary relationship does not render the entities interchangeable."  (Pls.' Resp. [DN 24] at 7.)  Defendant counters by stating that Defendant was a party to the contract, as the Employee Handbook defines "the Company" referenced in the Acknowledgment Forms as "Apollo Group, Inc. and its subsidiaries"; and, even if Defendant were found not to be a party, it would be able to enforce its parent's arbitration agreement on the basis of the parent/subsidiary relationship.  (Def.'s Reply [DN 26] at 7–8.)

The Acknowledgment Forms begin by stating that "The Apollo Group, Inc. Employee Handbook, Version 20.0, describes important information about this organization."  (Aldrich and Nolan Acknowledgment Forms [DNs 6-3, 6-4] at 2.)  In the next four paragraphs, the phrase "the Company" is used several times.  (Id.)  "The Company" is specifically described in the Employee Handbook as "Apollo Group, Inc. and its subsidiaries," including the University of Phoenix among other entities.  (Employee Handbook Foreword [DN 26-2] at 3.)  The Handbook clearly identifies the fact that "the Company" referenced in the Acknowledgment Forms is indeed referring to the University of Phoenix.  Read together, all relevant documents demonstrate that Defendant was a party to the arbitration agreement.

Even so, "nonsignatories may be bound to an arbitration agreement."[1]  Javitch v. First Union Sec., Inc., 315 F.3d 619, 629 (6th Cir. 2003).   "Non-signatories to an arbitration agreement may be bound by or enforce an arbitration agreement executed by other parties under theories arising out of common law principles of contract and agency law." Broaddus, 2008 WL 4525410, at *2 (citing In re Prudential Ins. Co. of America Sales Practice Litigation, 133 F.3d 225, 229 (3d Cir. 1998); Arnold v. Arnold Corp.-Printed Communications for Business, 920 F.2d 1269, 1281 (6th Cir. 1990) (if a party can avoid the practical consequences of an agreement to arbitrate by naming nonsignatory parties as defendants in his complaint, the effect of the rule requiring arbitration would, in effect, be nullified)); see Collie v. Wehr Dissolution Corp., 345 F. Supp. 2d 555, 561 (M.D.N.C. 2004).

Specifically, in the case of a parent-subsidiary relationship, the entity that was a nonsignatory to the contract can still enforce the arbitration agreement.[2]  See J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 320–21 (4th Cir. 1988) ("When the charges

---

[1] Plaintiffs argue that non-parties to a contract cannot enforce arbitration provisions. Plaintiffs cite first Moruzzi, in which the Court determined that individual plaintiffs did not have standing to enforce an arbitration agreement because the only two signatories to the arbitration agreement were the union and the defendant.  Moruzzi v. Dynamics Corp. of Am., 443 F. Supp. 332, 334 (S.D.N.Y. 1977).  The plaintiff claimed to be the party listed as "Local 478" (the union itself) as specified in the contract, but the court rejected this argument, finding the intent of the parties was never to confer rights on individuals on behalf of the union.  Id. at 336–37.  This provides no helpful analysis because in the Acknowledgment Forms at issue here, the term "the Company" is used, which is defined in the Employee Handbook as including the University of Phoenix.

Plaintiffs additionally attempt to make use of Backs, in which the court ruled that the defendants, who were parties to the arbitration agreement, attempted to enforce the arbitration agreement against a nonsignatory plaintiff.  United Am. Healthcare Corp. v. Backs, 997 F. Supp. 2d 741, 746 (E.D. Mich. 2014).  The court distinguished this case from J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315 (4th Cir. 1988) because, there, the nonsignatory had agreed to arbitrate, and Defendants proffered no convincing argument as to compel the nonsignatory plaintiff to arbitrate.  Id.  Here, the "nonsignatory," Defendant, like in Rhone, agreed to arbitrate, thus rendering this case inapposite, favoring Defendant's position rather than Plaintiffs'.

[2] Plaintiffs argue that Zurich applies here, stating that a "parent-subsidiary relationship is insufficient to bind [a nonsignatory] to an arbitration agreement." (Pls.' Resp. [DN 24] at 7.)  In Zurich, the Seventh Circuit held that "[a] corporate relationship is generally not enough to bind a nonsignatory to an arbitration agreement."  Zurich Am. Ins. Co. v. Watts Indus., Inc., 417 F.3d 682, 688 (7th Cir. 2005).  However, in this case, the subsidiary, Jones, was attempting to avoid arbitration because it was a nonsignatory.  Id.  Here, Defendant is not attempting to avoid arbitration and was mentioned in the Acknowledgment Forms by use of the phrase "the Company."  There is more than a "mere" parent-subsidiary corporate relationship here; express terms link the parent, Apollo Group, and the subsidiary, Defendant, together to form "the Company" as used in the Acknowledgment Forms.

against a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration agreement."); <u>Sam Reisfeld & Son Imp. Co. v. S. A. Eteco</u>, 530 F.2d 679, 681 (5th Cir. 1976) (affirming the district court's decision to include the defendant's parent and successor corporations in the suit even though they were not parties to the original contract for arbitration).

Illustratively, in <u>Broaddus</u>, the plaintiff signed an arbitration agreement with "the Company" called "Greenway." <u>Broaddus</u>, 2008 WL 4525410, at *1. "The Company" was defined as Greenway "or its owners, directors, officers, managers, employees, agents, and parties affiliated with its employee benefit and health plans." <u>Id.</u> Greenway, as the parent company, owned 75% of Rivergate Acquisitions, Inc. d/b/a Planet Kia. <u>Id.</u> The plaintiff was employed by Rivergate Acquisitions and asserted that because Rivergate was not a party to the contract, only Greenway was, Rivergate could not enforce the arbitration agreement. <u>Id.</u> at *2. The court ruled that there was "no genuine issue of material fact to dispute that 'Company' as defined in the agreement at issue includes Rivergate," as "Plaintiff, by agreeing to arbitrate with the 'Company,' agreed to arbitrate with its agent and subsidiary corporation, Rivergate Acquisitions, Inc. d/b/a Planet Kia, which was Plaintiff's employer." <u>Id.</u>

While Plaintiffs here argue that Defendant is not a party to the arbitration agreement, the Acknowledgment Forms are clear in their terms that they are between Plaintiffs and "the Company," which was explicitly defined in the Employee Handbook. The Acknowledgment Forms, in conjunction with the Employee Handbook, Version 20.0, clearly indicate that Plaintiffs were contracting with "the Company," including Defendant, the University of Phoenix. Based upon these unrefuted facts, the Court finds that there is no genuine issue of material fact to

dispute that "the Company" as defined in the Acknowledgment Forms at issue includes Defendant University of Phoenix.[3]  Additionally, Defendant's status as a subsidiary and agent of Apollo Group enables it to use the agreement to compel arbitration.  See Id.  Therefore, Defendant is bound by, and entitled to enforce, the arbitration agreement.  In addition, Plaintiffs, by agreeing to arbitrate with "the Company," agreed to arbitrate with its agent and subsidiary corporation, Defendant, which was Plaintiffs' employer, meaning Plaintiffs' lack of standing argument proves unsuccessful.

### D.  Lack of Contractual Agreement

Plaintiffs next argue that the Acknowledgment Forms did not create valid contracts for several reasons: 1) Defendant was not a party to the contracts; 2) neither Defendant nor the Apollo Group signed the Acknowledgment Forms; 3) the Forms are simply acknowledgments of receipt rather than agreements; and 4) the Acknowledgment Forms were not supported by sufficient consideration to be considered contracts.  Having addressed the first[4] and third[5] issues above, the Court will now address the second and fourth in turn.

First, Plaintiffs contend that "[e]ven if a signature is not required neither took any affirmative action indicating acceptance of a legally binding obligation."  (Pls.'s Resp. [DN 24] at 10.)  Plaintiffs offer support for this proposition by citing to Ally Cat, in which the Kentucky Supreme Court refused to enforce the arbitration provision found in the Home Owners Limited Warranty (hereinafter "HOLW") document that Dr. Russell, a plaintiff, received and signed, but not in her representative capacity as an agent for her company, Ally Cat, LLC, which was the

---

[3] The standard to be used in factual disputes regarding the validity of an arbitration agreement is the same as the summary judgment standard: "the nonmovant must show that there is a genuine issue of material fact as to the validity . . . of the agreement to arbitrate."  Broaddus, 2008 WL 4525410, at *1.

[4] See supra Part III.C. (regarding Defendant's standing to enforce these arbitration agreements as a party).

[5] See supra Part III.B. (regarding the routine acceptance of these types of acknowledgment documents as binding arbitration agreements).

named party to the HOLW.  Ally Cat, LLC v. Chauvin, 274 S.W.3d 451, 456 (Ky. 2009).  The court found that because she did not sign in her official capacity and because no representative of the defendant signed the document, it was not signed by any real parties in interest or their agents and thus was not an agreement "between the parties."  Id.  While this may have been true for the warranty agreement at issue, the law in this area regarding arbitration agreements is well-settled.

Written arbitration agreements need not be signed in order to be valid and enforceable. Seawright v. Am. Gen. Fin. Servs., Inc., 507 F.3d 967, 978 (6th Cir. 2007) (citing Fisher v. GE Med. Sys., 276 F. Supp. 2d 891, 895 (M.D. Tenn. 2003)); see also Caley v. Gulfstream Aero. Corp., 428 F.3d 1359, 1369 (11th Cir. 2005) ("We readily conclude that no signature is needed to satisfy the FAA's written agreement requirement."); Tinder v. Pinkerton Sec., 305 F.3d 728, 736 (7th Cir. 2002) ("Although § 3 of the FAA requires arbitration agreements to be written, it does not require them to be signed."); Daisy Mfg. Co. v. NCR Corp., 29 F.3d 389, 392 (8th Cir. 1994) (citation omitted) ("Ordinary contract principles determine who is bound by such written provisions and of course parties can become contractually bound absent their signatures."); Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 846 (2nd Cir. 1987) ("[W]hile the [FAA] requires a writing, it does not require that the writing be signed by the parties."); Valero Refining, Inc. v. M/T Lauberhorn, 813 F.2d 60, 64 (5th Cir. 1987) ("We note also that section three of the Act does not require that a charter party be signed in order to enforce an arbitration agreement contained within it."); Medical Development Corp. v. Industrial Molding Corp., 479 F.2d 345 at 348 (10th Cir. 1973) ("It [is] not necessary that there be a simple integrated writing or that a party sign the writing containing the arbitration clause.").

As the overwhelming majority of circuits agree, under the FAA, the arbitration agreement at issue need not be signed by the parties in order to be valid.  Therefore, even if Plaintiffs did

15

not electronically sign the arbitration agreements, they are still bound by the terms. Plaintiffs allege that some "affirmative action" demonstrating acceptance of the terms of the contract was needed in order to render the arbitration agreements valid and enforceable. Defendants did manifest their assent to the terms through offering the agreement in the first place. See SMA Portfolio Owner, LLC v. Corporex Realty & Inv., LLC, 112 F. Supp. 3d 555, 576–77 (E.D. Ky. 2015); Jones v. Bank of Harlan, No. CIV. 10–96–GFVT, 2012 WL 115586, at *3 (E.D. Ky. Jan. 12, 2012) (citing 17A Am. Jur. 2d Contracts § 45 (2011)); Messick v. Powell, 236 S.W.2d 897, 899–900 (1951). In terms of Plaintiffs' affirmative acts of acceptance, their continued employment can constitute acceptance of the terms of the arbitration agreement.[6]  Braxton v. O'Charley's Rest. Properties, LLC, 1 F. Supp. 3d 722, 727 (W.D. Ky. 2014). Plaintiffs continued to accept work assignments and receive compensation following the initiation of the agreements. Therefore, the arbitration agreement is enforceable under the FAA because there were affirmative acts of acceptance by both parties, and, as seen, a signature is not needed in order to demonstrate assent.

Plaintiffs additionally assert that the Acknowledgment Forms lacked sufficient consideration in order to be considered a valid contract. "Consideration for a contract can be either 'a benefit to the party promising or a loss or detriment to the party to whom the promise is made.'" Thomas & King, Inc. v. Jaramillo, No. CIV.A.08-191-JBC, 2009 WL 649073, at *6 (E.D. Ky. Mar. 10, 2009) (quoting Phillips v. Phillips, 171 S.W.2d 458, 464 (Ky.1943); Luigart v. Fed. Parquetry Mfg. Co., 238 S.W. 758, 760 (Ky. 1922)). Consideration also "can take the shape of mutual promises to perform some act or to forbear from taking some action." Summers Equip., LLC v. VFS U.S. LLC, No. 2009-CA-001321-MR, 2010 WL 4137434, at *4 (Ky. Ct. App. Oct. 22, 2010). But, Plaintiffs contend that under Creech v. Brown, 433 S.W.3d 342 (Ky.

---

[6] See infra Part III.E. (discussing in greater depth the issue of acceptance of terms and assenting to the contract).

2014), "continuation of at will employment is no consideration at all." (Pls.'s Resp. [DN 24] at 10.) While this statement may be accurate with regard to non-compete agreements, as was at issue in <u>Creech</u>, in regards to arbitration agreements the law is well-settled. "Kentucky precedent holds that continued employment is sufficient consideration to support an arbitration agreement." <u>Gatliff</u>, 2015 WL 510680, at *4 (citing <u>Spears v. Carhartt, Inc.</u>, 215 S.W.3d 1 (Ky. 2006)); <u>see</u> <u>Adkinson v. Prof'l Serv. Indus., Inc.</u>, 1998 WL 34202235 at *2–3 (W.D. Ky. May 11, 1998)).

Here, both Plaintiffs and Defendant mutually agreed to forebear from taking certain action. (Aldrich and Nolan Acknowledgment Forms [DNs 6-3, 6-4] at 1.) Both parties agreed to refrain from filing employment-related claims in a court of law and to arbitrate them instead. <u>Id.</u> This mutuality of obligation is evident in the express language of both the Employee Handbook and Acknowledgment Forms, and it is binding on parties on both sides. Further, Kentucky law permits continued employment to serve as valid consideration for arbitration agreements. Both Plaintiffs continued their employment with Defendant after the Acknowledgment Forms were released and Plaintiffs assented to their terms. (Def.'s Mem. Supp. Mtn. Dismiss [DN 6-1] at 6.) Both Plaintiffs continued accepting assignments and receiving compensation. (<u>Id.</u>) When taken together, the mutual forbearance and the continued employment, the arbitration agreements found in the Acknowledgment Forms are supported by consideration in order to form binding contractual agreements.

### E.  Lack of Acceptance of Arbitration Agreement

Plaintiffs further contend that, even if a valid arbitration agreement exists, it is not enforceable because they did not agree to its terms, as they neither received nor electronically signed the Acknowledgment Forms. (Pls.' Resp. [DN 24] at 11.) Plaintiffs each have submitted

declarations denying that Defendant sent an email linked to the Acknowledgment Forms, that the forms appeared on their respective MyHR pages, that the forms were ever provided as independent documents, and that the forms containing their personal information existed.  (Id. at 13.)   Plaintiff Nolan claims in her affidavit that she was on leave on the date that the Acknowledgment Form indicates it was signed.  (Nolan Affidavit [DN 24-5] at 3.)  Plaintiffs provide no further evidence to support their contentions other than copies of the Acknowledgment Forms.  Defendant has provided excerpts from the Employee Handbook evidencing the dispute resolution policy and the definition of "the Company," the signed Acknowledgment Forms, and affidavits of Lynette Tartaglio, the Director of Benefits in the Human Resources Department for Apollo Education Group, Inc., the parent company of Defendant, University of Phoenix, and Torrey Quintana, the Director HR Shared Services Center for Apollo Education Group.  (Tartaglio Affidavit [DN 6-2] at 1; Quintana Affidavit [DN 26-1] at 1.)  Tartaglio explained in her declaration that both Plaintiffs were given access to the MyHR page, which only they could access using their own unique password, and that Defendant's Human Resources Department emailed the Acknowledgment Forms to Plaintiffs, which they both then electronically signed according to Defendant's records.  (Tartaglio Affidavit [DN 6-2] at 2–3.)  Quintana explained that though Plaintiff Nolan insisted that she was on leave on the date that she signed the arbitration agreement, Defendant's Leave Administration Department, which Quintana oversees, had no record of her being on leave on that date, and the PeopleSoft HR System did not indicate that she was on leave at that time.  (Quintana Affidavit [DN 26-1] at 3.)

"The party opposing arbitration must identify a triable issue of fact concerning the existence of the agreement in order to obtain a trial on the merits of the contract."  Tinder v.

Pinkerton Security, 305 F.3d at 735. "Just as in summary judgment proceedings, a party cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial." Id. "The question therefore, is not whether plaintiff[s'] denial of receiving the arbitration email is sufficient to avoid arbitration, but rather, 'whether [plaintiffs have] produced sufficient evidence to raise a factual issue concerning whether [plaintiffs] and [defendant] are bound by a contract to arbitrate.'" Versmesse v. AT & T Mobility LLC, No. 3:13 CV 171, 2014 WL 856447, at *4 (N.D. Ind. Mar. 4, 2014) (quoting Tinder, 305 F.3d at 735). Plaintiffs here simply argue that because they denied ever receiving the email or the Acknowledgment Forms, there can be no valid arbitration agreement between the parties.

When a plaintiff argues that she did not receive the arbitration agreement, "Tinder counsels that to create an issue of fact on the issue of formation of an arbitration agreement, a plaintiff must do more than simply provide evidence, in the form of her own statement, that she did not see the arbitration agreement notice," when faced Defendant's evidence that notice was sent to the plaintiff. Versmesse, 2014 WL 856447, at *5 (citing Tinder, 305 F.3d at 735); see also Par–Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51, 55 (3d Cir.1980) ("A naked assertion . . . by a party to a contract that it did not intend to be bound by the terms thereof is insufficient to place in issue the making of the arbitration agreement for the purposes of . . . the [FAA].");. Therefore, Plaintiffs must present some form of evidence other than their "own statements" that "would raise an issue of fact concerning the formation of the arbitration agreement." Versmesse, 2014 WL 856447, at *5. Plaintiffs have failed to produce any such evidence. Instead, Plaintiffs merely assert in their affidavits that they never received the Acknowledgment Forms containing the arbitration agreements and that the forms never appeared

on the MyHR website.   Defendant has offered evidence to show that Plaintiffs signed the Acknowledgment Forms, as Defendant has attached copies of the forms as they appeared on the MyHR website and that personally identify each Plaintiff, complete with electronic signatures and date stamps.  Because Plaintiffs have offered nothing to discredit Defendant's evidence and because Defendant has furnished evidence that undercuts Plaintiffs' entirely unsubstantiated claims, Plaintiffs have not met their burden and have not produced enough evidence to raise a factual issue as to whether or not Plaintiffs and Defendants entered an agreement to arbitrate.

Plaintiffs additionally argue that continued employment does not demonstrate assent to the arbitration agreements.  The Sixth Circuit and the both the Eastern and Western Districts of Kentucky have "concluded that although [a] plaintiff had not formally signed the arbitration agreement, her continued employment constituted her assent to the agreement's terms." Braxton, 1 F. Supp. 3d at 727 (citing Seawright, 507 F.3d at 972–74; Polly, 2011 WL 93715, at *3–4 (noting that "[u]nder Kentucky law, parties can be bound to contracts, even absent a signature, when their actions indicate acceptance of the contract's terms," like "employment or continued employment")); see also Dawson v. Rent-A-Ctr. Inc., 490 F. App'x 727, 730 (6th Cir. 2012) (stating that the plaintiff need not have signed the arbitration agreement, but by continuing to work for the defendant, plaintiff manifested assent through his conduct); Pohlman v. NCR Corp., No. 12 CV 6731, 2013 WL 3776965, at *3 (N.D. Ill. July 17, 2013) (finding that plaintiff's continued work for the defendant can constitute assent to the arbitration policy); Spears v. Carhartt, Inc., 215 S.W.3d 1, 9 (Ky. 2006) (finding assent could properly be inferred from the fact that [plaintiff] continued in [her] employment after the [arbitration] provision took effect").  In fact, when a plaintiff continues her employment with defendant, that "*conduct*

*alone*" is "sufficient to bind her to the terms of the [arbitration agreement]." Jones v. U-Haul Co. of Massachusetts & Ohio Inc., 16 F. Supp. 3d 922, 935 (S.D. Ohio 2014) (emphasis added).

Plaintiffs continued their employment after the arbitration agreements were distributed. (Def.'s Mem. Supp. Mtn. Dismiss [DN 6-1] at 6.)   They both continued to take on new assignments and tasks and received compensation for their work.  (Id.)   Accordingly, the Court finds that this continued action constituted assent to the arbitration agreement and its binding arbitration requirement.   Therefore, the arbitration agreement is valid and enforceable under the FAA, regardless whether it was ever signed by Plaintiffs.  See Seawright, 507 F.3d at 978.   As such, to the extent Plaintiffs wish to pursue their claims against Defendant, they must do so in accordance with that agreement.

### F.  Class Action Waiver

Defendant argues that the Court should enforce the class action waiver found in the arbitration agreement and "order that no class-action proceedings may be prosecuted in this Court or in any arbitration involving the parties in accordance with the parties' Agreement." (Def.'s Mem. Supp. Mtn. Dismiss [DN 6-1] at 14.)   Defendant further contends that "the Kentucky Supreme Court [has] made clear that class-action waivers should be enforced in agreements governed by the FAA."  (Id. at 15 (citing Schnuerle v. Insight Commc'ns Co., L.P., 376 S.W.3d 561, 573 (Ky. 2012)).  The Court has found the arbitration agreement to be valid and enforceable; thus, Plaintiffs may not pursue their claims collectively as the arbitration agreements contain a class action waiver.  Although "[t]his makes arbitration considerably more expensive for the group as a whole . . . the Supreme Court has held that such waivers are enforceable despite the added cost."  Coram v. Shepherd Commc'ns, Inc., No. 3:14CV-298-

JHM, 2014 WL 4782826, at *5 (W.D. Ky. Sept. 24, 2014) (citing In American Exp. Co. v. Italian Colors Restaurant, 133 S.Ct. 2304, 186 L.Ed.2d 417 (2013)).

### Disposition: Dismiss or Stay the Action Pending Arbitration

A final consideration is whether the Court should dismiss this action or, instead, stay these proceedings pending arbitration. The Sixth Circuit, among various district courts, has held that in litigation, in which all claims are within the scope of the arbitration agreement, the Court may dismiss the matter without prejudice instead of staying the litigation. Ozormoor v. T–Mobile USA, Inc., 354 Fed. App'x 972, 975 (6th Cir. 2009) ("[Plaintiff] challenges the dismissal of his suit, asserting that 9 U.S.C. § 3 requires district courts to stay suits pending arbitration rather than dismiss them. We have already rejected that argument."); Hensel v. Cargill, Inc., 198 F.3d 245, 1999 WL 993775, at *4 (6th Cir. 1999) (unpublished table decision) ("Under § 3 of the FAA, if any separate claim is referable to arbitration, then a stay of proceedings on the remaining claims is mandatory. However, litigation in which all claims are referred to arbitration may be dismissed."); see also Green v. Ameritech Corp., 200 F.3d 967, 973 (6th Cir. 2000) ("The weight of authority clearly supports dismissal of the case when all of the issues raised in the district court must be submitted to arbitration."); Braxton, 1 F. Supp. 3d 722, 729 (W.D. Ky. 2014); Cox v. Gen. Elec. Co., 2013 WL 3811762, at *4 (S.D. Ohio July 22, 2013); Kovac v. Superior Dairy, Inc., 930 F.Supp.2d 857, 865 (N.D. Ohio 2013); Braverman Props., LLC v. Boston Pizza Rests., LP, 2011 WL 2551189, at *4 (W.D. Mich. June 27, 2011). Here, Plaintiffs do not argue that their claims fall outside the substantive scope of the arbitration agreement. Therefore, because the Court is satisfied that all of the Plaintiffs' claims are subject to arbitration, it will dismiss this action without prejudice, rather than stay these proceedings pending arbitration.

## IV. Conclusion

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss [DN 6] is **GRANTED**.

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

March 4, 2016

cc: counsel of record